## Case No. 8,793.

McGAW v. BRYAN et al.

[1 U. S. Law J. 88.]

District Court, S. D. New York. June 29, 1821.

REPEAL OF PATENTS FOR INVENTIONS — FORMS OF PROCEDURE—ACT OF 1793.

[The method intended to be provided in the tenth section of the act of 1793 [1 Stat. 323], relating to the repeal of patents is not that by scire facias or process in the nature thereof. according to the forms of the common law, and with the verdict of a jury. but was rather a summary proceeding intended to take the place of an examination into the merits of the invention before the issuance of the patent. and the remedy could only be invoked during the limited time of three years after the date of the patent. A rule to show cause why the patent should not be repealed was issued by the judge upon motion. accompanied by affidavits showing grounds satisfactory to him. If the patentee did not appear, the rule was made absolute and the patent repealed. If he did appear, the case was fully heard upon its merits before the judge alone upon affidavits or oral testimony. and judgment entered for the party found to be entitled thereto upon the evidence produced. Stearns v. Barrett, Case No. 13,337, disapproved.]

[This was an application under the tenth section of the patent act of 1793 for a rule to show cause why the patent granted June 29, 1821, to Thomas Bryan and William Bryan should not be repealed.]

J. A. Emmet, for complainant.
C. G. Haines, for patentee.

VAN NESS. District Judge. That the question I am now to consider involves serious difficulties is admitted. Wherever it has arisen, it has confounded the ingenuity of the bar, and perplexed the gravest deliberations of the bench. The true meaning of the tenth section of the patent law is indeed a great mystery. The profound obscurity in which, like the oracles of old, it is delivered to us, must continue to perplex the minds of men until a wiser generation shall arise to develope the hidden wisdom, and penetrate the dubious intentions of its authors. To be compelled to expound and to administer in some way a law confessedly incomprehensible, is certainly an unpleasant duty. That the exposition I shall give will afford general satisfaction. I have not the confidence to hope. In a case like this the most laborious ratiocination can produce but a poor result. The field is bare and barren, and presents nothing to aid our skill or labor. An approach to demonstration, I am persuaded, is not expected. Something like a rational exposition will be attempted.

The tenth section of the act of 1793 entitled "An act to promote the progress of useful arts, and to repeal the acts heretofore made for that purpose." is in these words: "Upon oath or affirmation being made before the judge of the district court, where the patentee. his executors. administrators or assigns. reside. that any patent, which shall be issued in pursuance of this act, was obtained surreptitiously, or upon false suggestion,

and motion made to the said court, within three years after issuing the said patent, but not afterwards, it shall and may be lawful for the judge of the said district court, if the matter alleged shall appear to him to be sufficient, to grant a rule that the patentee, or his executor, administrator, or assigns, show cause, why process should not issue against him to repeal such patent. And if sufficient cause shall not be shown to the contrary, the rule shall be made absolute, and thereupon the said judge shall order process to be issued against such patentee, or his executors, administrators, or assigns with costs of suit. And in case no sufficient cause be shown to the contrary, or if it shall appear that the patentee was not the true inventor or discoverer, judgment shall be rendered by such court for the repeal of such patent; and if the party at whose complaint the process issued, shall have judgment given against him, he shall pay all such costs as the defendant shall be put to, in defending the suit, to be taxed by the court and recovered by due course of law." This is not the first proceeding that has been instituted here, under this act, which for the sake of brevity is commonly denominated "The Patent Law." Several rules have within a year or two been applied for and granted; and in every case it was conceded by all the counsel that the hearing on the rule to show cause was final. That was the impression of the court, and no doubt of its correctness was ever expressed at the bar, until after the rule in this case, or the other now under consideration, was obtained. So far forth, therefore, as uniformity in anterior proceedings, and voluntary acquiescence of the counsel employed in them can produce the effect, it is the established practice of this court that the hearing on the rule to show cause is final and decisive between the parties; and that the process which issues, if the rule be made absolute. is in the nature of an execution to enforce the judgment of the court pronouncing the patent void, and to collect the costs.

In this case, however, the court has been pressed to review the course of practice it has hitherto pursued, and to adopt another. It is now contended that the hearing on the rule is not final, and its effect, if made absolute. nothing more than an order that a scire facias issue. That the words of the law afford some support to this view of the subject is readily conceded for they will admit, without violence, any construction which may suggest itself to the ingenuity of counsel, or may suit the feelings or the fancy of the parties. Unfortunately, we are destitute of all precedent but our own on this occasion, and have no judicial exposition of the tenth section of this act except that which is found in the case of Stearns v. Barrett [Case No. 13,337], determined in the circuit court of the United States for the First circuit. The decisions in that court are certainly entitled to great respect and attention; but I cannot accede to the conclusion of the learned judge in this instance, because it is at variance with the deliberate suggestions of my own mind, and not supported by the general principles applicable to the question, and is, in my conception, in direct conflict with the whole course of his own reasoning.

We are examining a statutory provision for the accomplishment of a given object, and yet we are perpetually referred to common law proceedings as the only mode of effectuating the legal purpose of the legislature. If it could be fairly shown that they were at all necessary to carry into effect the ultimate object of the law, I should resort to them without reluctance. No man venerates the common law, as a body of legal rules and maxims, applied and administered by means of safe and salutary forms, more than I do. But I am unwilling to consider all our legislation as necessarily subservient to the principles or practice of that celebrated code, and its application always dependent upon its formalities, often tedious, intricate or antiquated. In England it is expressly declared by statute that the value of patents shall be tried and determined according to the course of the common law. The second section of the act concerning monopolies, &c. (21 Jac. I, c. 3) provides "that all monopolies, letters patent, &c., and the force and validity of them, and every of them, ought to be, and shall be, forever hereafter, examined, heard, tried, and determined, by and according to the common laws of this realm, and not otherwise." Our act contains no direct reference whatever, to the common law, or its course of proceeding, in cases of this sort: But in consequence of the fundamental difference in the principles of the English and American patent laws. and the still wider difference in the manner of granting these exclusive rights or monopolies, has, as I conceive, very wisely, if not necessarily, established a different mode of investigating and determining the validity of a patent. As patents under our law are issued as a matter of course to all who will apply for them, swear they are inventors, and pay thirty dollars, it was natural, and in a great degree requisite, to protect the public against frauds and impositions, that some expeditious summary mode of investigating their merits and trying their validity should be provided. But the tenth section of our act contains the word "process," to which the acuteness of the bar has ascribed all the significance of the express and verbose enactments of the English statute, and a magic influence, which is triumphantly said to draw after it, and secure by adoption, all the statute and common law of England, applicable to this question. I have a profound veneration for the abilities of the gentlemen who have discoursed so eloquently and so learnedly, on the mysterious signification of this comprehensive term. I have often felt their power to fascinate the senses and bewilder the human intellect; but

I 'trust the habits inculcated by my occupation will enable me to resist their subtleties, and bring to the examination of the subject something like sedate reflection and plain sense.

In attempting to arrive at a just conclusion in this case, it may be useful to examine how far the mode of granting and obtaining patents in England and in this country is similar; and the difference which will be found to exist will facilitate, I think, our efforts to develop the meaning of the tenth section of the patent law, and to penetrate the true intentions of the legislature. In England, patents are grants of favor emanating from the crown. In the United States. they are on a very different footing. Here they are the creatures of the statute. The right to their enjoyment, and the modes of protection against their infringement, are all prescribed by statute. The proceedings to obtain a patent in England are tedious, complicated and expensive. It is prayed for by petition, addressed to his majesty, and presented with an affidavit to support it, at the office of the secretary of state for the home department. The answer to the petition is a reference thereof to the attorney or solicitor general, to consider it, and report what may properly be done in the premises. The report of the attorney or solicitor general, if favorable, must be taken back to the office of the secretary of state, for the king's warrant. The warrant is directed to the attorney or solicitor, and directs a bill to be prepared, which is done at their patent office. The bill, when prepared, goes to the office of the secretary of state for the royal signature. When this is obtained, it is carried to the signet office to be passed, and there a warrant is prepared, directed to the lord keeper of the privy seal, from whom a warrant goes to the lord chancellor, commanding him to cause the letters to be made patent, under the great seal of Great Britain.

During the progress and execution of all these formalities, two formal hearings, at least, can be obtained in opposition to the patent: 1st. The objections may be submitted to the attorney or solicitor general, before a report is made upon the petition, at the instance of either of the parties; he will assign a day to examine the claims of the petitioner, and the nature of the objections urged in opposition to the patent; and after a full hearing and consideration will decide whether to report in favor of or against the prayer of the petition. .2dly. If the decision of the attorney-general be in favor of granting the patent, the party opposing may have another hearing before the lord chancellor, previous to the sealing of the patent, when a more full and formal investigation may be had of the merits of the application, and the objections urged against its success. It is also said by Bridgman, that the issuing of the patent may be opposed. when it comes to the privy seal, which would be a third hearing upon the merits of the petition; although I have met with no case in which it has been had. The course adopted in another stage of the proceeding, supports and fortifies this authority. Those opportunities to contest the rights of the petitioner are obtained by means unknown to our law. They are privileges secured by entering what are called "caveats," the nature and effect of which seem sometimes to have been misunderstood, even in the country where they are in use. They were at times supposed by inventors to secure the right to a patent, although their inventions might be brought into use before they had obtained it; and then that at least they were sufficient to prevent a patent from being granted to another, for the invention to which they referred. But a caveat has no such operation. Its object, as is manifest from its form, is to obtain information of the intention of any other person to take out a patent for the discovery or invention, which in general terms it describes; and it is merely a request that notice of such an application may be given to the party who has taken the precaution to file the caveat. If the anticipated petition be presented, the notice desired is given, and when a time is assigned to hear the objections that may be argued against the patent. At this hearing upon the caveat, all objections to the patent are open, and "the propriety of it must be sustained in every particular." It is finally granted, or not, as the attorney-general or chancellor shall report.

By referring to the act of 1793, it will be seen that most of these formalities are discarded, and this complicated process is much simplified. No means whatever are provided, or opportunities afforded, to contest the novelty or utility, or general merits, of the patent applied for; and it is known that. practically, patents are granted as matters of course. if the applicant complies with the forms of the law, which are nothing more than presenting a petition to the secretary of state. describing the alleged invention or discovery. swearing that he is the inventor or discoverer, and paying thirty dollars for the fees of office. The letters patent, when prepared, it is true. are to be delivered to the attorney-general. who, however. never inquires into the merits of the subject, but merely takes care that the instrument is in due form. The ninth section provides for the appointment of arbitrators. where two or more persons apply for patents at the same time. for the same alleged invention or discovery; but this has no other use or efficacy, than to dispose of a momentary collision; for the parties. it seems, have nothing to do, but to decline an arbitration, and then successively take out patents, in their own names. This was the fact, and the course pursued by the parties to the very case cited (Stearns v. Barrett [supra]). and proves conclusively that the real merits of the applica-

tion never are, and never can be, made a subject of inquiry before the patent issues. That it never was intended to be, is evident from the proceedings and discussions upon the provisions of the bill.

It was originally proposed in congress, to vest the power of granting patents, in the district courts, and to connect with it the English system of proceeding upon caveats; thus affording to the public and particular objectors an opportunity of being heard, in opposition to the application, before the letters issued. This was a most important consideration, entitled to great weight and attention, with the view of protecting the community against fraud and imposition, and from the vexation and oppression incident to numerous and frivolous monopolies. The present arrangement was, however, preferred, and with its adoption was swept away all the law and the reason that sustains the proceeding by scire facias to repeal a patent. It presents scarcely a resemblance in any of its parts, to the model originally in the view of the legislature. Nearly all the formalities and solemnities attendant upon the granting of a patent or monopoly by the crown, were abolished, and the provision in the act of James, directing its validity to be tried and determined according to the course of the common law, was omitted in our statute. It was certainly well and proper that after a petitioner for a grant had successfully passed through three solemn and separate investigations of his claims, that his title should derive from the sanctions thus conferred upon it a good degree of security. It was therefore provided by statute in England that it should not be disturbed, but on an inquiry the most deliberate and solemn known to law; and it seems to me equally required by considerations of expediency and public safety that, when all preliminary inquiries are abolished, and monopolies and patents freely and gratuitously given to all who present themselves in the character of inventors or discoverers, there should be some easy and summary mode of investigating their merits and deciding on their validity. In England, as we have seen, this may be done repeatedly and thoroughly, before the patent goes forth; and I cannot believe, that here it was intended to be wholly dispensed with. Every presumption of reason and of law is against the position that under systems so fundamentally unlike, and circumstances so different, the expensive and dilatory forms of the common law were meant to be pursued in investigations of this sort. During their progress, an impostor or pretender might for a long time harass the community, and for a season reap the fruits of his iniquity and fraud. It is a settled principle that in framing one system after another, the parts omitted are not to be drawn into use by inference, but are abolished unless expressly preserved. The omission of the second section of the statute of James,

could not have been accidental. It was too important to be overlooked, and must be presumed to have been discarded, as inapplicable to the new system which was recommended. It must be recollected, too, and as a circumstance entitled to great weight in estimating the intention of the legislature, that the execution of the tenth section of our act is confided to a tribunal which does not ordinarily proceed according to the course of the common law; and, as all the members of the committee that reported the bill were professional men, it must have occurred to them that the power it conferred upon the district court would be exercised after the course of its principal jurisdiction, unless otherwise directed and provided by the act. This circumstance, together with the cotemporaneous proceedings in congress, the radical departure from the English system of granting patents, the omission of the second section of the statute of James, and the total absence of any equivalent provision, press irresistibly upon my mind the conclusion that the proceedings under this section were not meant to be according to the course of the common law, but that it was intended to invest the district judge with a plenary supervision over the legality of patents, as a substitute for the English mode of proceeding upon caveats; that it was deemed inconvenient or impracticable to make the proper preliminary inquiries, in the first instance, at the department of state, and more expedient that they should be instituted upon complaint made in a regular manner before the district judge, in whom it had in the first instance been proposed to vest a discretionary power to grant these letters patent. That a summary inquiry into the nature, novelty, utility, and validity of these grants ought to be somewhere provided for and made, must be obvious to the common sense of the world. No community could long endure a system that exposed it to the perpetual ravages of pretenders, or the incessant contributions of impostors, levied upon articles in common use, or to the vending of dangerous and noxious compositions, unless some prompt and summary mode existed to investigate the fraud and abolish it. The construction of the tenth section of the patent law resolves itself then, as I conceive, into a question of vital importance to the value and safety of the whole system; and the exposition I have hitherto given it is sustained by the most direct and urgent expediency.

Against the weight and pressure, however, of all these considerations, whether resulting from legal deductions or drawn from expediency, I am still urged to the conclusion that the word "process" means a scire facias, and draws after it the whole course of the common law proceedings to repeal the patent. The subject therefore must be pursued, and if it shall be shown that a scire facias cannot in this case be issued upon any principles, or in pursuance of any

practice known to the common law, I shall hope that the refutation of the argument is accomplished. In England the grants of the crown are consummated by the lord chancellor. They are enrolled in the petty bag office, and remain of record in chancery. They may be repealed or vacated. 1st. When the king has granted two patents for the same thing, the first patentee may have process, in the name of the king, to repeal the second. 2d. When a patent has been granted upon a false suggestion, the king can direct process to issue to vacate his own grant; and 3d. When the patent expresses a grant which by law the king cannot make. The appropriate process to repeal a patent in that country, and under their institutions and laws, is a scire facias. A scire facias is a judicial writ, and must, from its form and nature, be founded on some matter of record. To repeal a patent, it must invariably issue out of chancery, because there is the record of the patent, and from that reason alone it can issue from no other court. I have somewhere seen a loose dictum that it may issue from the king's bench, but that is not law. It cannot issue from any court without a record to sustain it. It may go from some other court, if a forfeiture appears there of office; that is, a record that will support the writ. It is even questionable whether the chancellor can make it returnable into the king's bench. If he should do so, perhaps that court would take jurisdiction, but the regularity of that course would at this day be much doubted. The writ is of course and of right returnable into chancery. The issue is there made up, and sent down to the king's bench to be tried. A scire facias to repeal a patent cannot issue at all without the fiat of the attorney-general; without the permission of the crown, sued for by petition, and thus announced by his principal law officer. It must issue, too, in the name of the king, as the source from which, by virtue of his prerogative, the grant proceeded. It never does, and never can issue in the name of an individual complainant or relator, although, upon the petition of a prior patentee, the right to use the king's name will be conceded.

If, then, we are to go out of the statute, and be governed in the use of a scire facias by the principles of the common law and the practice of its courts, upon what authority. it may now be asked, can a scire facias issue in this case? We have not the record of the patent. That is in the department of state. No inquisition nor forfeiture appears by office found in any of the courts. The United States are not complainants, and their law officer has in no way sanctioned this proceeding. These are indispensible prerequisites in proceeding according to the course of the common law, and the absence of them all proves incontrovertibly that upon its principles, and according to its practice, no scire facias can now go forth. By resorting to the common law, we find, it is true, the form of a scire facias to repeal a patent; but I am unwilling at one moment to appeal to that law to enlighten and direct me, and the next violate all its precepts, and disregard all the rules it prescribes. If we go to the common law for the form of the process, we must go to it to ascertain the occasions that authorize and the principles that regulate its use. Every tyro can turn to his books and give us the form of a sci. fa. to repeal a patent; but to what purpose, unless the circumstances of the case justify its use? What avails it to have the form of a fi. fa. or a ca. sa. before you, unless you have a judgment on record to authorize its execution?

The act establishing this court, it is said, gives its power to issue a scire facias. So it does, "agreeable to the principles and usages of law." And it has been proved that "principles and usages" do not authorize it to send forth this writ, as it is called, without some matter of record to support it. This court derives power from the judiciary act to issue this process upon its own records, upon recognizances to revive judgments, and in all cases in which the courts of common law in England could issue it. That is the authority given by the act, and it goes no farther. The English courts can not issue it to repeal a patent; nor can this, unless the power is clearly and expressly given by statute. We are told, too, that although legally and technically the proposed process should be deemed inadmissible, yet something in the nature of a scire facias may be devised, with a view to procure the trial by jury. But if it cannot be done "agreeable to the principles and usages of law," it can not be done at all. From the judicial act we derive no power or authority to invent, model, or make a new and illegitimate thing, such as never yet was thrown before the profession, and profanely call it a scire facias, according to the forms of the common law. It is alleged that the ninth section of the act of '89 provides for the trial by jury of all issues of fact. It certainly does to the whole extent of the jurisdiction it confers; but no rule of construction can extend the operation of that provision to cases not within the purview of the act. It confers limited jurisdiction, and directs how it should be exercised. The power granted by the patent law, is no part of the ordinary or general jurisdiction of the district court. That act invests it with new authority. To its general powers it superadds new and independent jurisdiction; and for the manner of exercising it we must look to the act which confers it. When the proper occasion shall occur. there will, I trust, be neither doubt nor difficulty as to the construction of the act of '89. It should be recollected, however, that the question before us is whether an issue that can go to a jury shall be formed, and how? When that shall be accomplished, there will be no contro-

versy as to the farther course to be pursued. With all my respect for the wisdom that devised the trial by jury, and all my veneration for the important securities derived from that great and salutary institution, I cannot accede to the suggestion that this is a question peculiarly fit to be submitted to the decision of a jury. The validity and legality of patents are questions that involve important distinctions of law, and are so intimately blended with legal considerations as to render them, in my judgment, generally most proper for the exclusive examination of this court.

After due deliberation, and a careful examination of the act, I can find nothing in the section itself, nor in the context, nor in the report of the proceedings of the congress that enacted the law, leading to the conclusion that a scire facias, or process in the nature of a scire facias, according to the forms of the common law, and the verdict of a jury against the patentee, were anticipated or intended by congress as preliminary steps to the process of repeal, which the section directs the district judge to issue. I remain of the opinion that all the judicial authority intended to be given by the tenth section is vested exclusively in the district judge; that the proceeding under it was meant to be summary, and that no other can be had, without more detailed legislative provision on the subject. For there is now no law of the United States to authorize and regulate it, and no practice in England by which it can be justified. The course pursued here is prompt and efficacious, as is obviously required by the nature of the case. It enables the judge with authority analogous to equity powers to effect all that under a different organization, in conformity with the English system, might have been accomplished by scire facias, caveat, or bill in equity. As to the mode of proceeding, I shall maintain the course pursued by Messrs. Ely, Authon and McCoun, in the first case that came before me, and adopt their reasoning in support of it.

It will be seen, by a reference to the section under consideration, in an early stage of these remarks, that upon oath or affirmation made before the judge, that the patent was obtained "surreptitiously, or upon false suggestion," a motion may be made, within three years after it was issued, for a rule that the patentee "show cause why process should not issue against him to repeal such patent." And if the matter alleged shall appear to the judge to be sufficient, it shall be lawful for him to grant the rule. If, in answer to the rule, sufficient cause shall not be shown, it shall be made absolute, and thereupon he shall order process to be issued with costs of suit.

The first obvious remark to be made here is that the process to be issued is process to repeal the patent, not process commanding or summoning the patentee to show cause why it should not be repealed. The phrase, "a rule to show cause," is technical language, and its meaning is therefore to be ascertained from its common legal acceptation. A rule to show cause why a certain thing should or should not be done in the progress of a suit at law, why a defendant should not be discharged on common bail, why bail should not be mitigated; why proceedings should not be set aside; becomes absolute as a matter of course against the party to whom it is addressed, unless he complies with the exigence of the rule; that is, unless sufficient cause be shown, the defendant will be discharged, or the bail will be mitigated, or the proceedings set aside.

The construction contended for on the other side denies to an absolute rule the character of absoluteness, and converts it into an interlocutory rule, effecting nothing absolutely or definitely, but serving merely as the basis for a writ in the nature of a writ of scire facias. Now, a scire facias, though it may vary somewhat in form, is in fact nothing more than a rule or summons to show cause. So that a rule to show cause is to be an anomaly in our judicial proceedings, and means only that the party defendant is to show cause why another rule to show cause should not be served upon him. It is impossible that a construction leading to conclusions so absurd, should be correct.

The rule to show cause is granted upon evidence sufficient, in the opinion of the judge (unless contradicted), to make the patent void. It seems to me to follow inevitably that unless contradicted, it is made void. The rule is made absolute, and the patent made absolutely void, upon the evidence already produced, because nothing effectual has been shown in opposition to it. The construction I am opposing involves another glaring absurdity. The complainant is not only to swear or affirm that "the patent was obtained surreptitiously or upon false suggestion," but must do more, if required; for "the matter alleged must appear to the judge to be sufficient." He must therefore go into the merits of the case, ex parte, before he grants the motion; and when the defendant appears the judge is bound to examine into the merits of the cause he shows, why his patent should not be repealed. A scire facias, or another rule to show cause, with reference to a jury trial, at this stage of the proceedings, and under such circumstances, would reverse the whole order of judicial administration, and subject the decision of the judge, on a matter upon which he was compelled to decide, to the supervision of a jury summoned to re-examine and re-judge the decision already pronounced by the court. This would be a great novelty, to say the least of it; and to the adoption of it I feel some repugnance. The common sense and true law of the section I apprehend to be this: The affidavits on which the motion is founded should not only state that the patent was obtained "surreptitiously and upon false suggestion," but

the particular facts in the case, to which those terms refer. and of which they are predicable. Upon such an application the judge decides whether the matter alleged is sufficient. If it be, he grants a rule to show cause why the patent should not be repealed by process from his court. If the defendant does not appear, the sufficient allegations stand uncontradicted; the rule for a repeal is made absolute. and process of repeal. including authority to levy the costs, is issued. It is equivalent to a judgment by default. If, however, he does appear, the third clause in the section becomes applicable. For what purpose can he appear. except to answer the allegations on which the rule was granted? And how can a scire facias be necessary, commanding him to appear. when he has appeared already? Having appeared. a regular hearing is had upon the merits of the cause shown, which can be no other than whether his title to the patent be good or bad. If it shall appear to the judge that the patentee was not the true inventor or discoverer, or if the cause shown be for any other reason deemed insufficient, then upon this formal hearing a formal judgment shall be rendered by the court for the repeal of the patent: but if the cause shown be sufficient, then judgment shall be given against the complainant for the costs of the defendant.

Upon the appearance of the party, the proceedings should be analogous to those, on other rules of a similar kind. The defendant makes his defence with like weapons, to those brought against him by affidavits. The witnesses may also be openly examined as bail are on a justification. Thus. according to my view, the three clauses of which the section is composed. contains three distinct provisions, and each is made to effectuate a distinct purpose. The first gives the rule to show cause. Under the second, for defects in the cause shown, or the non-appearance of the party, the rule is made absolute, and by reason of his default is declared to be repealed. The third supposes an appearance. and gives a final judgment upon a full hearing in favor of one or other of the parties. This seems to me a plain and regular course of proceeding. I perceive nothing that can throw a doubt over the meaning of the legislature, but the repetition of the word "sufficient," in the second and third clauses of the section. That in the second, it is presumed, was inadvertently inserted. If expunged, the entire section. I think; would be relieved from all doubt. It is certainly worthy of particular observation that, although the act was drawn by three able lawyers, the familiar and well known terms "scire facias" and "trial by jury," do not once occur in the section we have been considering. It is hardly credible that professional men could have avoided their use, if they intended to convey the meaning ascribed to them by the counsel for the patentee. And it is equally preposterous to suppose that they would talk of "showing cause" before a jury, when we all know that this language is technically and professionally appropriated to summary proceedings before the court.

The principles of the former act of 1790 [1 Stat. 109] afford, it is believed, a farther illustration of this subject. The first section of that act directs the petition to be presented to the secretary of state, the secretary for the department of war, and the attorney-general. They, or any two of them, are authorized to cause letters patent to be issued, "if they shall deem the invention or discovery sufficiently useful and important." Thus it was made the duty of these officers to inquire into the utility and importance of the proposed patent before it issued; and the period for instituting a subsequent inquiry, like the present, was limited to one year. The investigations, however, at the departments, necessarily summary, were found inconvenient in practice. and the act now in force abolished them by omitting the words which imposed the duty, but made the patent subject to this mode of examination, for three years after it was granted, as a substitute for the provision in the first act intending, obviously, to preserve the summary character of the inquiry during that period. Why else is the time limited? It could not have been meant to close the door forever after to common law proceedings. No, for three years the inquiry is to be summary. and then the community is left to the other remedies provided by the statute. If this be not the meaning of the legislature, this kind of property is invested with a character and clothed with a sanctity not conceded to any other in the country. The whole course of legislation on the subject has confirmed me in the conviction that it never was intended to abolish all kind of summary inquiry into the validity of these grants. and that the course I have adopted, and the exposition I have given of the tenth section, is in coincidence with the true meaning of the act.

I can but regret that the remarks I have made on this question are unavoidably irregular and desultory. They have been committed to writing during the sitting of the court, and under the embarrassments resulting from the daily pressure of other important business.